1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10  RONALD REED,

11              Plaintiff,              No. CIV S-05-0060 DFL GGH P

12       vs.

13  DR. B. WILLIAMS,

14              Defendants.             <u>ORDER</u>

15  _____/

16  <u>Introduction</u>

17              Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. §

18  1983.  Pending before the court is defendant Silva's motion to dismiss, filed on October 6, 2005,

19  to which plaintiff filed an opposition on October 31, 2005.

20  <u>Complaint</u>

21              This action is proceeding on the original complaint, filed on January 11, 2005,

22  against four defendants: Dr. B. Williams, C/Sgt.[1] T. Frates, C/O[2] W. Moore, Acting Chief

23  Deputy Warden J. Silva.  Although only plaintiff's claims against defendant Silva are at issue

24  _____

25       [1] Correctional Sergeant.

26       [2] Correctional Officer.

1

1   with this motion, the court will set forth the allegations of the complaint in full to provide

2   context.

3          On June 25, 2001, plaintiff was placed in administrative segregation (ad seg),

4   having been found guilty of mutual combat with no serious injury against a drunken, 6'1", 215-

5   pound life term inmate named Welch, who was a cellmate.  Defendant C/O Moore several days

6   later informed plaintiff, who is 5'11' and 185 pounds (or was at the time) that he was to be moved

7   to a cell with an inmate named Thornton, 6'1", weighing 225 pounds, known as a "violent

8   psychotic schitzo and mental patient on psychotropic medications," in the ad seg unit for beating

9   another inmate in the face with a hot clothes iron.  Complaint, p. 3.  Plaintiff opposed the

10  placement to defendant Moore based on this information to no avail; Moore told plaintiff to

11  move anyway.

12         Within about two days of plaintiff's having been compelled to share a cell with

13  Thornton, Thornton began to threaten plaintiff that he would smash plaintiff in the head with his

14  television.  That day, plaintiff stopped defendant Moore and told him that Thornton was very

15  hostile toward plaintiff, called him derogatory names and had threatened him with smashing his

16  head with his TV.  Defendant Moore told plaintiff that he could not move plaintiff unless the

17  move was ordered by someone of higher rank than himself.  Plaintiff told Moore he wanted to

18  talk to a sergeant in that case.  Moore walked away, saying: "I'd just whip his ass."  Complaint,

19  p. 3.

20         About an hour later, plaintiff got the attention of Library Technical Assistant

21  (LTA) Ramos (not a defendant) and told him he needed to speak with a sergeant due to

22  Thornton's threatening behavior.  In about another hour later, defendant C/Sgt. T. Frates

23  appeared, whereupon plaintiff explained Thornton's behavior in detail; plaintiff stated that he

24  wanted to move because he did not feel safe with Thornton.  He also said he knew Thornton had

25  been in ad seg for similar violence with which he was threatening plaintiff, that he was a mental

26  patient on psychotropic meds, that he received medication for epilepsy and plaintiff did not want

1  to be held responsible should Thornton attack plaintiff and then have a heart attack because

2  plaintiff defended himself.  When defendant Frates called into the cell to ask Thornton if the

3  problem between plaintiff and Thornton was that serious, Thorton affirmed that it was, adding:

4  "if you don't separate us, then one of us is going to come out in a body bag."  Frates' response,

5  before walking off, was: "there's nothing I can do about it; do whatever you have to do and just

6  handle your business."  Plaintiff defended himself.  Complaint, pp. 3-4.

7          Plaintiff made every effort to avoid Thornton as much as possible; on July 9,

8  2001, about two days after plaintiff had spoken to defendants Frates and Moor, Thornton became

9  irate and hostile over plaintiff's having shuffled papers while writing a letter on his bunk.

10  Thornton ripped his TV cable from his TV, called plaintiff a "bitch," punched him in the face

11  and began to try to pull plaintiff off the bunk.  Plaintiff shoved Thornton off and told him he did

12  not want any problems.  Thornton swung at plaintiff; plaintiff ducked and punched Thornton in

13  the face, knocking him against the cell door and to the floor.  Thornton immediately sprang to his

14  feet, charging plaintiff, after which they fought throughout the cell for what seemed like a very

15  long time to plaintiff.   When Thornton finally stopped attacking plaintiff, plaintiff immediately

16  began to bang on the cell door yelling for the guards.  Complaint, p. 4.

17          Thornton attacked plaintiff from behind, as plaintiff called for the guards.

18  Plaintiff turned and fought him down until he stopped again, then plaintiff continued to call the

19  guards.  Plaintiff saw C/O Pollard (not a defendant) looking up from the ground floor and

20  plaintiff yelled for him to come up before he or his cellmate was killed.  Blood was on plaintiff's

21  face, the door, the cell door window.  Meanwhile, other inmates yelled through the vent,

22  encouraging Thornton to keep up the attack.  Plaintiff told Thornton he did not want to keep

23  fighting and that he should just let the guards come and separate them.  Thornton just charged

24  again.  Plaintiff fought and outlasted Thornton a third time.  Again, plaintiff banged on the door,

25  yelling for the guards.  Pollard eventually came to the cell door.  More guards arrived; plaintiff

26  and Thornton were placed into mechanical restraints and escorted from the cell to a medic.

1  Afterward, Thornton was returned to the cell, and plaintiff was placed in a different cell.

2  Plaintiff was later found guilty of mutual combat with no serious injury.  Complaint, p. 5.

3        On October 1, 2001, defendant Acting Chief Deputy Warden J. Silva, made a

4  referral to the Amador County District Attorney, seeking a criminal prosecution against plaintiff.

5  Plaintiff was charged by the Amador County D.A. with aggravated assault against inmates Welch

6  and Thornton.  Plaintiff was subjected to several criminal court proceedings and the mental and

7  emotional stress attendant to his possibly receiving two 25-year-to-life terms under state law.

8  The Amador County Superior Court case was filed on May 23, 2002, Case No.02-CR-1775, and

9  dismissed on November 1, 2002.  Plaintiff suffered the mental and emotional anguish of

10 believing he would spend his life in prison regarding a situation that he did everything within

11 reason that he could do to prevent the incident and which situation, if the prison officials

12 involved had acted appropriately, could have been prevented.[3]

13        In or around October of 2002, defendant Moore asked plaintiff what was

14 happening with regard to the Thornton incident and when plaintiff told him he was being

15 prosecuted, Moore asked, "for what?"  When plaintiff told him that he was subject to two 25-

16 year-to life terms for the cell fight [sic], Moore said: "Yeah, that's what I heard.  That's not

17 right."  Plaintiff asked defendant Moore if he remembered plaintiff asking him to take him out of

18 the cell with Thornton, he replied: "Yes."  Moore said, "Yes, I remember everything," when

19 plaintiff asked if he recalled plaintiff asking him to get the sergeant.  When plaintiff told Moore

20 that Sgt. Frates did not do her job and he could sue her, Moore replied: "Yes, you could, but do

21 you think she is actually going to get on the stand and say she didn't do her job?  And why are

22 you asking me these questions?"  When plaintiff told him he was going to subpoena him to court

23 to repeat what he had just stated, Moore responded: "I don't remember anything."  The next day

24 as plaintiff exited cell 104, Moore said to plaintiff: "Aye 104! You can kiss my black ass!  I ain't

25

26 [3] The court presumes he is referring specifically to the Thornton, rather than the undeveloped Welch, incident.

4

1   doing nothing for you!"  Complaint, p. 6.

2              Although plaintiff suffered physical injuries in the form of lacerations and bruises

3   to his face and body, "severe trauma" to both shoulders, broken bones in his right hand and "a

4   broken nasal passage" from the fight with Thornton, the diagnosis and treatment for his injuries

5   did not occur until almost two years after the incident.  Plaintiff also contracted Hepatitis C from

6   the Thornton incident.  Id.

7              The incident occurred on July 9, 2001; on August 5, 2002, x-rays and blood tests

8   were ordered by non-defendant Dr. Douglass.  When the medical department failed to follow up

9   on the doctor's orders, plaintiff submitted requests and inquiries complaining of the lack of

10  treatment.  When he was interviewed by defendant Dr. Williams, the Health Care Manager,

11  plaintiff was personally assured by him that he would see to it that he got the necessary x-rays,

12  blood tests and medical treatment.  Nevertheless, plaintiff was not called for x-rays and blood

13  tests until March 18, 2004, in response to his March 1, 2004, administrative appeal, made after

14  numerous requests were not responded to.  Id.

15             On March 18, 2004, the blood tests revealed the Hepatitis C.  The April 30, 2004

16  x-rays of his face revealed the fractured nasal passage.  X-rays taken on May 21, 2004, of his

17  hands and right shoulder showed plaintiff has a fractured distal right metacarpal.  At Manteca

18  Hospital to which plaintiff was referred, bones spurs were discovered that must be removed and

19  it was determined that a steel rod needs to be inserted in plaintiff's shoulder, for which surgery

20  plaintiff was awaiting at the time of filing his complaint.  The prison medical dept. refused to

21  diagnose plaintiff's left shoulder and had discontinued his pain medication for three months after

22  he returned from Manteca Hospital, where he had been given a steroid shot for his right shoulder.

23  The Manteca physician had prescribed plaintiff 800 mg. of Ibuprofen until March 2005.

24  Although the prescription has been reinstated, plaintiff is in constant, severe pain, twenty-four

25  hours a day.  Complaint, p. 7.

26  \\\\\

1    Defendants Frates and Moore deprived plaintiff of his right to equal protection

2    and inflicted cruel and unusual punishment upon him in violation of the Fourteenth and Eighth

3    Amendments, by placing him in and then failing to remove him from an unsafe situation.

4    Defendant Silva denied plaintiff equal protection and due process under the Fourteenth

5    Amendment and inflicted cruel and unusual punishment under the Eighth Amendment by

6    instigating and subjecting plaintiff to an unwarranted criminal prosecution "under false

7    pretense." Defendant Williams failed to provide plaintiff adequate medical care, subjecting him

8    to cruel and unusual punishment under the Eighth Amendment. Complaint, p. 8. Plaintiff seeks

9    monetary, including punitive, damages and declaratory and injunctive relief.

10   Motion to Dismiss

11   Only defendant Silva moves to dismiss, the remaining defendants having

12   answered the complaint. As to him, defendant Silva contends plaintiff has failed to state a claim

13   for which relief can be granted.

14   *Legal Standard for Fed. R. Civ. P. 12(b)(6) Motion*

15   A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil

16   Procedure tests the sufficiency of the complaint. North Star Internat'l v. Arizona Corp. Comm'n,

17   720 F.2d 578, 581 (9th Cir. 1983). Dismissal of the complaint, or any claim within it, "can be

18   based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a

19   cognizable legal theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990);

20   see also Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 534 (9th Cir. 1984).

21   In considering a motion to dismiss for failure to state a claim, the court accepts as

22   true all material allegations in the complaint and construes those allegations, as well as the

23   reasonable inferences that can be drawn from them, in the light most favorable to the plaintiff.

24   Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232 (1984); Love v. United

25   States, 915 F.2d 1242, 1245 (9th Cir. 1989). The court must "presume that general allegations

26   embrace those specific facts that are necessary to support the claim." NOW, Inc. v. Schiedler,

6

510 U.S. 249, 256, 114 S. Ct. 798, 803  (1994).  All doubts must be resolved in the plaintiff's

favor.  Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S. Ct. 1843, 1848-49 (1969).  Pro se

pleadings are held to a less stringent standard than those drafted by lawyers.  Haines v. Kerner,

404 U.S. 519, 520, 92 S. Ct. 594, 595 (1972).

The court may disregard allegations in the complaint if they are contradicted by

facts established by exhibits attached to the complaint.  Durning v. First Boston Corp., 815 F.2d

1265, 1267 (9th Cir. 1987).  Furthermore, the court is not required to accept as true allegations

that contradict facts which may be judicially noticed.  Mullis v. United States Bankruptcy Ct.,

828 F.2d 1385, 1388 (9th Cir. 1987).  The court may consider matters of public record, including

pleadings, orders, and other papers filed with the court.  Mack v. South Bay Beer Distributors,

798 F.2d 1279, 1282 (9th Cir. 1986).  The court need not accept as true conclusory allegations,

unreasonable inferences, or unwarranted deductions of fact.  Western Mining Council v. Watt,

643 F.2d 618, 624 (9th Cir. 1981).

A motion to dismiss for failure to state a claim should not be granted unless it

appears beyond doubt that plaintiff can prove no set of facts in support of the claims that would

entitle him to relief.  Hishon, 467 U.S. at 73, 104 S. Ct. at 2232 (citing Conley v. Gibson, 355

U.S. 41, 45-46, 78 S. Ct. 99, 101-02 (1957)); Cervantes v. City of San Diego, 5 F.3d 1273, 1274-

75 (9th Cir. 1993).

*Discussion*

Defendant Silva contends that plaintiff's allegations against him, that Silva denied

him his rights to equal protection and due process in reporting two fights (with Welch and

Thornton) to the Amador County District Attorney, and inflicted cruel and unusual punishment

in the form of mental anguish when plaintiff believed he would spend the remainder of his life in

prison, which prosecution was instituted but later dismissed, fails to state a claim.  Motion to

Dismiss (MTD), pp. 4-7.

\\\\\\

1        Plaintiff purports to have made a claim under the equal protection clause.  The

2   Equal Protection Clause "is essentially a direction that all persons similarly situated should be

3   treated alike."  City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439, 105 S. Ct.

4   3249, 3254 (1985).  A classification which disadvantages a suspect class or impinges on the

5   exercise of a fundamental right is subject to strict scrutiny.  Plyler v. Doe, 457 U.S. 202, 216,

6   217, 102 S. Ct. 2382, 2395 (1992).  When prison practices are at issue, the state's interest in the

7   safety and security of the institution justifies interference with an inmate's fundamental rights as

8   long as the interference reasonably furthers this interest.  Washington v. Harper, 494 U.S. 210,

9   223-24 (1990).

10       If plaintiff is intending to show that he was discriminated against by defendant

11  Silva in having referred him to the district attorney for possible prosecution because of his

12  involvement in cell fights, the facts he has set forth do not adequately support such a claim.  As

13  defendant notes, plaintiff has not shown that he has been treated differently from any other

14  inmate in a fight with his cellmate, under the applicable regulation, CAL. CODE REGS. tit.xv, § tit.

15  15 § 3316 (regulation governing the referral for criminal prosecution of criminal misconduct by

16  California state prison inmates).  "States are not prohibited from imposing special treatment on a

17  class of offenses."  Baumann v. Arizona Dept. of Corrections, 754 F.2d 841, 846 (9th Cir. 1985)

18  [citations omitted].

19       Plaintiff, in his opposition, attempts to strengthen his allegation that he was not

20  treated equally as others similarly situated by averring that in other prisoner cases of assault not

21  resulting in serious injury, referrals are not made to the DA for criminal prosecution because,

22  without serious injury, the element of "great bodily injury" is not supported.  Opp., p. 3.  Even if

23  plaintiff's argument is supportable, plaintiff has not alleged facts that show that defendant's

24  conduct in referring prison disciplinary findings related to prison cell fights on the face of it was

25  not rationally related to a legitimate state interest.  Id.  This claim against defendant Silva should

26  be dismissed.

As to any putative claim for a violation of procedural due process, again as defendant contends, plaintiff makes no claim that he was denied due process with respect to the criminal proceedings he underwent (which were eventually dismissed).  Opp., p. 5.  Defendants also contend that plaintiff has not alleged facts that Silva had any part in the DA's decision to prosecute the action.  Id.  In his opposition, plaintiff attempts to frame a due process denial by Silva, contending that he first induced a guilty plea (by reducing the offense) and then used the plea as the basis for a "false prosecution."[4]  Opp., p. 4.  It appears that plaintiff is seeking to allege that he has been subjected to a violation of his substantive, rather than procedural, due process rights by the actions of defendant Silva.  Plaintiff fleshes out his claim in his opposition by alleging that defendant Silva was the chairperson of the Classification Committee who reviewed the Rules Violation Report (RVR) hearing with regard to the incident involving plaintiff and inmate Welch.  Opp., p. 1.  That committee found no serious injury occurred and plaintiff was released from ad seg back to the general population (gp).  Id.

While Lieutenant Machado was the Senior Hearing Officer over the RVR hearing involving plaintiff's involvement in the fight with inmate Thornton, plaintiff avers that defendant Silva was the Chief Disciplinary Officer with respect to the proceeding.  Opp., p. 2.  Lt. Machado, according to plaintiff, informed him that defendant Silva had advised Machado to negotiate a guilty plea to the lesser offense of mutual combat with plaintiff "in exchange for their being (1) no DA referral for criminal prosecution[;] (2) no Security Housing Unit (SHU) term requested[;] (3) no credit loss imposed [; and 4] plaintiff would be released from ad seg back to gp."  Id.  Plaintiff's agreement to enter a statement of guilt was based on those terms.

Notwithstanding defendant Silva's assurances, as conveyed through Machado, one and a half months later, he referred the matter to the DA's office, using plaintiff's statement at

---

[4] Had plaintiff been deprived of time credits and this action were a petition for writ of habeas corpus seeking restoration of time assessed in violation or breach of a plea agreement, plaintiff, as petitioner, might indeed, have raised a colorable due process challenge.

the disciplinary hearing as evidence against plaintiff.  Id.  Plaintiff was charged with several

counts, including assault with a deadly weapon and was accused of inflicting great bodily injury

upon Welch and Thornton.   Id.[5]

Thus, however plaintiff articulates it, his due process claim is not one wherein he

seeks to raise procedural, but rather substantive, due process questions.  Historically, "the core of

the concept" of due process has been to protect the individual from the arbitrary action of

government.  County of Sacramento v. Lewis, 523 U.S. 833, 845, 118 S. Ct. 1708, 1716 (1998).

> We have emphasized time and again that "[t]he touchstone of due
> process is protection of the individual against arbitrary action of
> government, Wolff v. McDonnell, 418 U.S. 539, 558, 94 S.Ct.
> 2963, 2976, 41 L.Ed.2d 935 (1974), whether the fault lies in a
> denial of fundamental procedural fairness, see, e.g., Fuentes v.
> Shevin, 407 U.S. 67, 82, 92 S.Ct. 1983, 1995, 32 L.Ed.2d 556
> (1972) (the procedural due process guarantee protects against
> "arbitrary takings"), or in the exercise of power without any
> reasonable justification in the service of a legitimate governmental
> objective, see, e.g., Daniels v. Williams, 474 U.S., at 331, 106
> S.Ct., at 664 (the substantive due process guarantee protects
> against government power arbitrarily and oppressively exercised).
> While due process protection in the substantive sense limits what
> the government may do in both its legislative, see, e.g., Griswold v.
> Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965),
> and its executive capacities, see, e.g., Rochin v. California, 342
> U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), criteria to identify
> what is fatally arbitrary differ depending on whether it is legislation
> or a specific act of a governmental officer that is at issue.

County of Sacramento v. Lewis, at 845-846, 118 S. Ct. at 1716.

The intent of the due process clause is to prevent government officials from

abuses of power or from " 'employing it as an instrument of oppression.'" Id., at 846, 118 S. Ct.

1716 [internal citations omitted].  In cases of "abusive executive action," that is, the type of

conduct that is alleged and is at issue with respect to defendant Silva herein, "only the most

egregious official conduct can be said to be 'arbitrary in the constitutional sense....'" Id., at 846,

118 S. Ct. at 1716.  The "cognizable level of executive abuse of power" is "that which shocks the

---

[5] Plaintiff includes various exhibits in support of his opposition which were not attached
to his complaint.

conscience." Id., at 846, 118 S. Ct. at 1717.

> We first put the test this way in Rochin v. California, supra, at 172-173, 72 S.Ct., at 209-210, where we found the forced pumping of a suspect's stomach enough to offend due process as conduct "that shocks the conscience" and violates the "decencies of civilized conduct." In the intervening years we have repeatedly adhered to Rochin's benchmark. See, e.g., Breithaupt v. Abram, 352 U.S. 432, 435, 77 S.Ct. 408, 410 [] (1957) (reiterating that conduct that " 'shocked the conscience' and was so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency" would violate substantive due process); Whitley v. Albers, 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, [] (1986) (same); United States v. Salerno, 481 U.S. 739, 746, 107 S.Ct. 2095, 2101 [] "So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' ··· or interferes with rights 'implicit in the concept of ordered liberty' ") (quoting Rochin v. California, supra, at 172, 72 S.Ct., at 209-210, and Palko v. Connecticut, 302 U.S. 319, 325-326, 58 S.Ct. 149, 151-152, 82 L.Ed. 288 (1937)). Most recently, in Collins v. Harker Heights, supra, at 128, 112 S.Ct., at 1070, we said again that the substantive component of the Due Process Clause is violated by executive action only when it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." While the measure of what is conscience shocking is no calibrated yard stick, it does, as Judge Friendly put it, "poin[t] the way." Johnson v. Glick, 481 F.2d 1028, 1033 (C.A.2), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

County of Sacramento v. Lewis, at 846-847, 118 S. Ct. at 1717.

The "threshold question" in assessing whether the alleged conduct of defendant Silva implicates plaintiff's substantive due process rights is whether Silva's action was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Id. Plaintiff claims that Silva authorized a negotiated plea to a lesser disciplinary offense (with respect to the Thornton incident), including an agreement not to refer the matter for state court criminal prosecution, and then used that very plea as the (or a) basis for a criminal felony prosecution referral, which felony requires more culpable conduct than that to which plaintiff pled guilty or for which plaintiff was found guilty at the hearing. Because of this conduct, plaintiff was charged by the DA, was involved in some initial court proceedings, suffered great emotional distress thereby, the charges eventually being dismissed for lack of sufficient evidence.

1   Even assuming the truth of plaintiff's allegations, as the court must on this motion to dismiss,

2   based on the limited cases wherein substantive due process rights have been found to have been

3   violated, plaintiff simply does not make out such a claim sufficiently outrageous, egregious or

4   shocking to the conscience on these facts.

5           Nor is the Eighth Amendment implicated in the conduct of defendant Silva.

6   Defendant argues that, in the context of the charges that arose as a result of Silva's referral,

7   plaintiff was a pretrial detainee to whom the Eighth Amendment was inapplicable and that the

8   Eighth Amendment is not applicable to plaintiff's claim of infliction of mental anguish.  MTD, p.

9   6, citing Bell v. Wolfish, 441 U.S. 520, 537 n. 16 (1979).  Plaintiff, although he frames it as an

10  argument against defendant, also contends in his opposition that he had pretrial detainee status

11  and was entitled to Fourteenth Amendment due process protection with regard to the charges to

12  which he was subjected by the actions taken by defendant Silva.  Both parties are off point on

13  this issue.  During the pendency of such criminal charges as were proceeding against him, arising

14  from prison disciplinary findings, he was a convicted prisoner subject to the protections of the

15  Eighth Amendment.  His claim with regard to the charges brought by the DA arising from the

16  alleged prison discplinary offenses does not ameliorate his status to that of a pretrial detainee

17  when, during that period, he remained an individual serving a prison sentence as a result of

18  having been found guilty of underlying state law felony offenses.[6]

19          Plaintiff alleges that he was subjected to cruel and unusual punishment as a result

20  of the emotional anguish he suffered because of Silva's referral of his prison misconduct to the

21  DA, who then referred charges against him, under Cal. Penal Code § 4501,[7] resulting in a period

22  _____

23      [6] Plaintiff contends that defendant violated the doctrine of equitable estoppel by using
    facts to support a charge that plaintiff had committed a felony offense which had been
24  determined at disciplinary proceedings not to support a finding that an assault causing serious
    injury had been committed.  Opp., p. 3.  The concept of equitable estoppel is not apposite in this
25  context.

26      [7] This code section states, in relevant part: "[E]very person confined in a state prison of
    this state who commits an assault upon the person of another with a deadly weapon or

of time before the charges were dismissed that he feared he might spend his entire life in prison.

"[T]he Eighth Amendment prohibits punishments which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain,' or are grossly disproportionate to the severity of the crime."  Rhodes v. Chapman, 452 U.S. 337, 346, 101 S. Ct. 2392, 2399 (1981) [citations omitted].   Plaintiff's mental anxiety in this context does not implicate the Eighth Amendment.  Baumann v. Arizona Dept. of Corrections, 754 F.2d at 8 46 (emotional distress arising from a prison official's failure to allow release from prison is not cruel and unusual punishment).

         With respect to the Eighth Amendment violations he claims, plaintiff's allegations of emotional distress simply do not implicate the constitutional prohibitions of that amendment. Intentional or negligent infliction of emotional distress generally does not rise to the level of an Eighth Amendment violation.  See Austin v. Terhune, 367 F.3d 1167, 1171 (9th Cir. 2004); but see, Jordan v. Gardner, 986 F.2d 1521 (9th Cir. 1993) (male guards' body searches of female inmates who had previously been subjected to sexual abuse causing severe and continuing emotional distress constitutes cruel and unusual punishment).   To constitute the requisite level of "wantonness" necessary to a violation of the cruel and unusual clause, "the baseline mental state is deliberate indifference."   Jordan, supra, 986 F.2d at 1527-28, citing Wilson v. Seiter, 501 U.S. 294, 302, 111 S. Ct. 2321, 2326 (1991).

         In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court defined a very strict standard which a plaintiff must meet in order to establish "deliberate indifference."  Of course, negligence is insufficient.  Farmer, 511 U.S. at 835, 114 S. Ct. at 1978. However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm which is so obvious that it should be known) is insufficient.  Id. at 836-37, 114 S. Ct. at 1979.

---

instrument, or by any means of force likely to produce great bodily injury, shall be guilty of a felony and shall be imprisoned in the state prison for two, four, or six years to be served consecutively."

1   Neither is it sufficient that a reasonable person would have known of the risk or that a defendant

2   should have known of the risk.  Id. at 842, 114 S. Ct. at 1981.

3         Plaintiff has not sufficiently made out an Eighth Amendment claim against

4   defendant Silva where this individual was responsible only for making a referral and not for

5   actually formulating any charges against plaintiff.  Although on these facts it does not appear to

6   the court that plaintiff can frame allegations of the deprivation of a constitutional right by

7   defendant Silva, plaintiff will be given leave to do so within 30 days.

8         If plaintiff chooses to amend the complaint to state a claim for which relief may

9   be granted as to defendant Silva, plaintiff must demonstrate how the conditions complained of

10   have resulted in a deprivation of plaintiff's constitutional rights.  See Ellis v. Cassidy, 625 F.2d

11   227 (9th Cir. 1980).  The complaint must allege in specific terms how defendant Silva is

12   involved.  There can be no liability under 42 U.S.C. § 1983 unless there is some affirmative link

13   or connection between a defendant's actions and the claimed deprivation.  Rizzo v. Goode, 423

14   U.S. 362 (1976); May v. Enomoto, 633 F.2d 164, 167 (9th Cir. 1980); Johnson v. Duffy, 588

15   F.2d 740, 743 (9th Cir. 1978).  Furthermore, vague and conclusory allegations of official

16   participation in civil rights violations are not sufficient.  See Ivey v. Board of Regents, 673 F.2d

17   266, 268 (9th Cir. 1982).

18         In addition, plaintiff is informed that the court cannot refer to a prior pleading in

19   order to make plaintiff's amended complaint complete.  Local Rule 15-220 requires that an

20   amended complaint be complete in itself without reference to any prior pleading.  This is

21   because, as a general rule, an amended complaint supersedes the original complaint.  See Loux v.

22   Rhay, 375 F.2d 55, 57 (9th Cir. 1967).  Once plaintiff files an amended complaint, the original

23   pleading no longer serves any function in the case.  Therefore, in an amended complaint, as in an

24   original complaint, each claim and the involvement of each defendant must be sufficiently

25   alleged.  In this case, plaintiff need not amend any claims as to the remaining or answering

26   defendants, but should he seek to amend his complaint to state a claim as to defendant Silva, he

14

1  must incorporate as well all the other claims with respect to all of the other defendants against

2  whom he is proceeding in his original complaint.

3         Plaintiff has previously requested appointment of counsel, which request the court

4  denied.  See Order, filed on November 9, 2005.  Upon another review of the case, however, the

5  undersigned has now determined that this case may be appropriate for appointment of counsel.

6         The United States Supreme Court has ruled that district courts lack authority to

7  require counsel to represent indigent prisoners in § 1983 cases.  Mallard v. United States Dist.

8  Court, 490 U.S. 296, (1989).  In certain exceptional circumstances, however, the court may

9  request the voluntary assistance of counsel pursuant to 28 U.S.C. § 1915(e)(1).  Terrell v.

10  Brewer, 935 F.2d 1015 (9th Cir. 1990); Wood v. Housewright, 900 F.2d 1332 (9th Cir. 1990).  In

11  this case the court is not sure whether those exceptional circumstances exist or not.  Therefore,

12  this court will refer this case to the civil rights panel in this district for review.

13         Plaintiff is cautioned, nevertheless, that while the case is under review, he has

14  responsibility to continue to prosecute his action.  The court is not staying the litigation pending

15  the review; rather the review and continued processing of this case will take place at the same

16  time.  No scheduled dates in this litigation are vacated; for example, plaintiff's amended

17  complaint must be filed within 30 days should he wish to proceed on an amended complaint.

18  Also, it may ultimately turn out that volunteer counsel may not be procurable for plaintiff's case.

19         Accordingly, IT IS HEREBY ORDERED that:

20         1.  Defendant Silva's motion to dismiss, filed on October 6, 2005, is granted and

21  defendant Silva is dismissed from this action with leave granted for plaintiff to file an amended

22  complaint as to defendant Silva within 30 days;

23         2.  In any amended complaint, plaintiff must incorporate all of his claims as to

24  each defendant; should plaintiff fail to filed an amended complaint, the court will recommend

25  dismissal of defendant Silva from this action.

26  \\\\\\

1           3.  The University of California, King Hall Civil Rights Clinic shall review the

2  case file and inform the court of their decision as to whether they will seek to be substituted in as

3  counsel for plaintiff, within 30 days.

4           4.  The Clerk of the Court is directed to serve a copy of this order upon Carter

5  White, Supervising Attorney at the King Hall Civil Rights Clinic at the University of California

6  at Davis (UCD), and a separate copy of this order on Professor Bill Hing, also at the UCD Law

7  School.

8  DATED: 8/22/06

9                             /s/ Gregory G. Hollows

10                          GREGORY G. HOLLOWS
                             UNITED STATES MAGISTRATE JUDGE

11  GGH:009
    reed0060.mtd

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26