IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RONALD REED,

        Plaintiff,                      No. CIV S-05-0060 RRB GGH P

    vs.

DR. WILLIAMS, et al.,

        Defendants.             ORDER

_____/

Introduction

        Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. § 1983.  Pending before the court is plaintiff's February 23, 2007, motion for issuance of a subpoena to which defendants filed an opposition on March 16, 2007, and plaintiff filed his reply on March 27, 2007.

Plaintiff's Allegations

        In order to better address the issues raised by plaintiff's motion, the court herein sets forth the allegations of the second amended complaint, filed on January 12, 2007, naming three Mule Creek State Prison (MCSP) employees as defendants: Dr. B. Williams, C/Sgt.[1] T.

---

[1] Correctional Sergeant.

Frates, and C/O[2] W. Moore.[3]  Plaintiff seeks money damages, including punitive damages, for violations of his rights under the Eighth Amendment both in the form of inadequate medical care for plaintiff's serious medical needs against defendant Williams, and against defendant Frates and Moore for deliberate indifference to a substantial risk posed to plaintiff's safety.[4]  Second Amended Complaint (SAC), pp. 1-3, 11-14.

       Plaintiff alleges that he is an inmate who is not classified as EOP, a classification for severely mentally ill inmates; nor is he classified CCCMS, a classification for less severely mentally ill prisoners; nor has he been classified or diagnosed with any mental illness per any CDCR designation.  Nevertheless, in late June, 2001, while plaintiff was housed in administrative segregation (ad seg), plaintiff was informed by defendant Moore that he was to be placed in a cell with an EOP classified inmate named Thornton, CDCR no. P-76816.  SAC, p. 4.

       Thornton is much larger than plaintiff and was known to plaintiff as being psychotic; at the time of the impending move, it was commonly known in ad seg that Thornton was housed there for having beaten another inmate with a hot clothes iron.  Plaintiff informed defendant Moore that he did not want to be placed in the same cell as Thornton, a violent EOP inmate, likely to attack plaintiff.  Nevertheless, defendant Moore placed plaintiff in handcuffs and dragged him to Thornton's cell, pushing plaintiff inside and removing plaintiff's handcuffs through the cell door slot.  Immediately, plaintiff began to suffer "mental trauma" arising from

---

[2] Correctional Officer.

[3] Plaintiff names another individual, an Officer C. Pollard, but identifies him as "an important witness," and not as a defendant. Second Amended Complaint (SAC), p. 4.

[4] Although plaintiff also invokes the Fourteenth Amendment's due process provisions, the gravamen of his cause of action arises under the Eighth Amendment. Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871 (1989) (amendment providing "an explicit textual source of constitutional protection...must be the guide for analyzing" claims implicating government conduct over the "more generalized notion of 'substantive due process....'"); Whitley v. Albers, 475 U.S. 312, 327,102 S. Ct. 1078 (1986)(Fourteenth Amendment Due Process Clause affords prison inmate "no greater protection than does the Cruel and Unusual Punishments Clause" of the Eighth Amendment.

his constant fear of being attacked by Thornton, possibly fatally.  Within two days, Thornton "threatened to murder plaintiff by bashing plaintiff's brains out with a television." SAC, p. 5.

That same day, plaintiff told defendant Moore that Thornton had threatened to bash plaintiff's head in with a TV and begged Moore to move him out of the cell immediately, but defendant Moore refused.  Plaintiff asked to speak to someone with supervisory authority so that plaintiff could inform him of Thornton's threat and plaintiff could be moved from the cell.  Defendant Moore refused to call a supervisor or to notify anyone of the danger.  Instead, defendant Moore told plaintiff that plaintiff should attack Thornton to reduce plaintiff's risk.  Moore walked away, saying: "I'd just whip his ass."  SAC, pp. 5-6.

About an hour later, plaintiff got the attention of Library Technical Assistant (LTA) Ramos (not a defendant), told him about Thornton's threat and about his having struck another inmate with a hot iron, and asked Ramos to tell a sergeant.  Shortly thereafter, defendant C/Sgt. T. Frates appeared, whereupon plaintiff explained Thornton's threatening behavior, his prior violence with the iron, that plaintiff's not being diagnosed as mentally ill angered Thornton further; he told him about Moore's advice, and asked to be moved.  Defendant Frates then asked Thornton if the problem between plaintiff and Thornton was "that serious," to which Thornton replied, "If you don't separate us, then one of us is going to come out in a body bag."  Frates' response, before walking off, which plaintiff believes encouraged Thornton, was: "There's nothing I can do about it; do whatever you have to do and just handle your business."  Defendant Frates took no steps to move either plaintiff or Thornton. SAC, pp. 6-8.

About two days later, on July 9, 2001, Thornton ripped his cable from his TV, and punched plaintiff in the face while trying to try to pull plaintiff off his bunk.  Thornton charged plaintiff and plaintiff fought off the larger man until he stopped, which caused injuries to both of them.  Plaintiff began yelling and banging for the guards in order to be rescued, but Thornton attacked plaintiff again from behind.  Both men were injured further as plaintiff fought off the second attack.  As plaintiff saw and called to C/O Pollard (not a defendant), Thornton attacked

3

plaintiff for a third time, adding to their injuries.  C/O Pollard and other guards responded, removing plaintiff from the cell.  SAC, pp. 8-9.

Thornton inflicted lacerations and bruises to plaintiff's face and body, severe injuries to his shoulders for which plaintiff is now scheduled for long-delayed surgery, broken bones in his right hand, a damaged nasal passage, which is constantly painful and from which his nose still bleeds.  Plaintiff contracted Hepatitis C from the attacks, presumably due to Thornton's blood having infected him.  Plaintiff has been severely traumatized by the assault and by defendants Moore's and Frates' actions and failure to act to protect him. SAC, p. 9.

Plaintiff submitted medical requests for treatment of the broken bones in his hand and the injuries to his shoulder; not until August 5, 2002, (more than a year later), did Dr. Douglas, not a defendant, order x-rays and blood tests, which order MCSP medical staff did not follow.  When plaintiff submitted additional requests, inquiring as to why the orders were ignored, defendant Dr. Williams responded that he had reviewed plaintiff's medical file and that plaintiff would receive the ordered tests and any necessary treatment.  Some nineteen months later, in response to plaintiff's administrative appeal, on March 18, 2004, the blood tests ordered by Dr. Douglas on August 5, 2002, were finally completed and plaintiff was discovered to have contracted Hepatitis C.  SAC, pp. 9-10.

On May 21, 2004, twenty months later, the x-rays Dr. Douglas had ordered on August 5, 2002, were finally taken, revealing a fractured right distal metacarpal and shoulder injury, prompting a further diagnostic examination, which further exam demonstrated that a steel rod had to be inserted in plaintiff's shoulder.  As this surgery had not been completed at the time this second amended complaint was filed, plaintiff continued to suffer constant pain from his untreated injury at the time of filing.  SAC, p. 10.

\\\\\

\\\\\\

\\\\\

4

Plaintiff's Motion for a Subpoena

Plaintiff, citing Fed. R. Civ. P. 45(a)(3),[5] asks that the Clerk of the Court issue a blank, signed subpoena so that he might subpoena the mental health and prison disciplinary records of inmate Thornton, P-76816 from CDCR.[6]  Plaintiff asserts that the files are critical to prove the deliberate indifference of defendants Frates and Moore, as set forth in his second amended complaint.  See Motion for Issuance of Subpoena.

Defendants oppose the issuance of a subpoena on the grounds that these records are privileged under federal and state law, are overbroad, and that the issuance is premature. Defendants argue that there is a psychotherapist privilege under federal law extending to confidential communications between psychiatrists and psychologists and their patients during treatment and diagnosis, citing Petersen v. U.S., 352 F. Supp. 2d 1016, 66 Fed. R. Evid. Serv. 297 (D.S.D. 2005), and that under California law, a patient may refuse to disclose, or prevent another from disclosing, a confidential communication between patient and psychotherapist, citing Cal. Evid. Code § 1010,[7] People v. Superior Court, 231 Cal. App. 3d 584, 590 (1991). Opposition (Opp.), p. 3.  Defendants contend that Thornton's central and medical files cannot be disclosed under state law without prior notice to the subject of the information and court order, under Cal. Civ. Code § 1798.24(k).[8]  Id.  Defendants contend that under CAL. CODE REGS. tit.xv, §

\\\\\

\\\\\

---

[5] This rule states, in relevant part: "The clerk shall issue a subpoena, signed but otherwise blank, to a party requesting it, who shall complete it before service."

[6] California Department of Corrections and Rehabilitation.

[7] This code section sets forth the definition of "psychotherapist."

[8] Under Cal. Civ. Code § 179824(k), personal information linked to the individual to whom it pertains may be disclosed by a state agency "to any person" if the disclosure is "pursuant to a subpoena, court order, or other compulsory legal process if, before the disclosure, the agency reasonably attempts to notify the individual to whom the record pertains, and if the notification is not prohibited by law."

5

3370,[9] inmates have no access to another prisoner's case file, and that the information is protected from disclosure pursuant to Cal. Civ. Code §§ 1798, et seq., and Cal. Code Civ. Proc. § 1985.3. Id.  As to federal law, defendants state that a prisoner cannot access the protected health information of another except, as provided under the Health Insurance Portability and Accountability Act of 1996, in response to discovery and orders in judicial proceedings, but that the regulations contemplate that the records will not be released until the individual whose records are to be disclosed is notified and given an opportunity to submit objections upon which the court would rule prior to disclosure.  Opp., pp. 3-4.  According to defendants, the regulations bar disclosure of psychotherapy records without authorization.  Id., at 4.  Finally, with respect to a claim of privilege defendants refer to federal common law as recognizing a qualified privacy privilege in personal information, citing Pagano v. Oroville Hospital, 145 F.R.D. 683, 698-99 (E.D. Cal. 1993), discussed below.

   The requests are overbroad, according to defendants, with regard to plaintiff's request for Thornton's psychiatric records because plaintiff already has information that Thornton was in the mental health treatment program at the EOP level of care in the incident report of which plaintiff has received a copy.  Opp, p. 4 & Exh. A.  As to Thornton's disciplinary records, any such reports after his fight with plaintiff would be neither relevant nor admissible, defendants argue.  Opp., p. 4.

   The requests are premature, according to defendants, because, while plaintiff has asked defendant Frates what she knew about Thornton, "she has no present recollection of him." Opp., pp. 4-5.  Nevertheless, defendants believe plaintiff should be compelled to pose a similar interrogatory to defendant Moore because plaintiff "should be required to establish what the defendants knew or didn't know before he goes fishing in Thornton's records."  Opp., p. 5.  In

---

[9] "Inmates or parolees may review their own case records file. This review shall be conducted in the presence of staff, and may necessitate the use of a computer." CAL. CODE REGS. tit.xv, § 3370(b).

the alternative, defendants move for a protective order, limiting the scope of the records sought, allowing redaction and permitting inspection of the records only.  In the alternative motion for a protective order, defendants ask that the court "at a minimum" limit plaintiff to Thornton's prison disciplinary and mental health records prior to July 9, 2001.  Opp., pp. 5-6.

*Discussion*

What Law Applies

In this action based solely on alleged violations of the federal Constitution, federal law applies in terms of substantive, privilege and discovery law.  Kerr v. USDC, 511 F.2d 192, 198 (9th Cir. 1975); Whittall v. Henry Schein, Inc., 2006 WL 90257 (E..D. Cal. 2006).  The state law cited by defendants is either inconsistent with the federal privilege law, or, as in the case of disciplinary records, duplicative of the standard for disclosure.  Thus, defendant's assertion of state privilege law is ineffectual.

It is ineffectual even considering that the Health Insurance Portability and Accountability Act (HIPPA) is involved.  That act contains a provision permitting more stringent state law restriction of disclosure of medical records, 42 U.S.C. § 1320d-2 Note; however, that provision applies only to state court proceedings, and not those in federal court proceeding on federal law.  Northwestern Memorial Hospital v. Ashcroft, 362 F.3d 923, 925-926 (7th Cir. 2004).

Analysis

1.  Medical Records

Federal law does not recognize a generic medical information privilege.  The Supreme Court has flatly stated that "[t]he physician-patient evidentiary privilege is unknown to the common law. [Citations.]" Whalen v. Roe, 429 U.S. 589, 602, n. 28, 97 S. Ct. 869, 877, n. 28, 51 L. Ed. 2d 64 (1977). (But see, dissent of Chief Justice Burger in Dept. of Air Force v. Rose, 425 U.S. 352, 387, 96 S. Ct. 1592, 1611, 48 L. Ed. 2d 11 (1976), in which he noted "[t]he law's long established physician-patient privilege.") The Ninth Circuit, while noting "that the

Hippocratic tradition of physician non-disclosure of patient secrets is ancient," In re Grand Jury Proceedings, 867 F.2d 562, 565 (9th Cir.1989), abrogated on other grounds Jaffe v. Redmond, 518 U.S. 1, 116 S. Ct. 1923 (1996) (establishing psychotherapist/patient privilege), has also declined to recognize a physician-patient privilege. Id., at 564; In re Grand Jury Proceedings (Doe), 801 F.2d 1164, 1169 (9th Cir.1986). When asked to develop such a rule in deference to, and as a matter of comity with, California's statutory physician-patient privilege, the Ninth Circuit declined, even though it recognized "that Congress intended that the courts have flexibility to develop rules on privileged communications on a case-by-case basis when it enacted Fed.R.Evid. 501." In re Grand Jury Proceedings, 867 F.2d at 564.

However, the Supreme Court has recognized a specific psychotherapist-patient privilege. Jaffe v. Redmond, 518 U.S. 1, 116 S. Ct. 1923 (1996). Significantly, the Supreme Court eschewed any balancing test involving the importance of the information versus the need for privacy. Id. at 17-18, 116 S. Ct. 1932. Thus, if the information is privileged, it will remain undisclosed regardless of the need for such information in the case. The Ninth Circuit has also viewed the newly created privilege in two aspects: the need for confidentiality outside of trial, and the testimonial privilege. United States v. Chase, 340 F.3d 978 (9th Cir. 2003). The privilege is so strong that even if privileged information is disclosed to prevent prospective, imminent harm, no testimony may be had at trial concerning the disclosed information.

Nevertheless, one must remember that the privilege only applied to the substance of *confidential communications* between the patient and the psychotherapist. Phelps v. Coy, 194 F.R.D. 606, 608 (S.D. Ohio 2000). A general characterization of the patient's conditions, a classification, warnings and similar information disclosed to prison officials (assuming that privileged communications would not be disclosed) might well not be privileged. Id.

The court must review the medical records *in camera* to determine what may be privileged under Jaffe and what is not.

\\\\\

1      The court need not be detained long with defendants' arguments of irrelevancy or
2 overbeadth of these records.  The point is not, as defendants argue, what *plaintiff* already knew
3 about Thornton's condition or record, but what *defendants* would and should have known from
4 the records, e.g., what was disseminated on a need to know basis or otherwise.  What defendants
5 knew about the aggressor patient's dangerous proclivities and when they knew it is the crux of
6 this Eighth Amendment case; of course, warnings, et al., about the aggressor patient found in the
7 records would be entirely relevant.

8      Nor does defendants' reliance on HIPAA preclude *in camera* review, or even
9 ultimate disclosure of non-*Jaffe* protected information.  The procedures which restrict/permit
10 disclosure of a patient's medical information by a "covered entity" do not create a privilege in
11 non-dissemination of medical records.  United States v. Beck, __F.3d__, 2007 WL 1950380 (7th
12 Cir. 2007).  If the information sought is not Jaffe privileged, and the procedures for disclosure of
13 the non-privileged information are followed, the information is then disclosed.  The HIPAA
14 regulations regarding disclosure of medical information permit disclosure of such information
15 upon court order.  45 C.F.R. 162.512(e):

16 " Standard: Disclosures for judicial and administrative proceedings.

17 (1) Permitted disclosures. A covered entity may disclose protected health
information in the course of any judicial or administrative proceeding:

18

19 (i) In response to an order of a court or administrative tribunal, provided that the
covered entity discloses only the protected health information expressly
authorized by such order; or...

20

21      The only issue remaining concerns the logistics of subpoena issuance.  The court
22 could authorize that a subpoena issue to plaintiff who could attempt service of the subpoena on
23 CDCR.  However, such a procedure would be cumbersome and would undoubtedly require more
24 work for all concerned to iron out the foreseeable snafus.  The undersigned chooses to issue a
25 court subpoena pursuant to this order, and shall order defendants' counsel to serve the subpoena
26 on CDCR (a task that should not be burdensome given the relationship of CDCR to the present

1 defendants).

### 2. Disciplinary Records

As stated in Sanchez v. City of Santa Ana, 936 F.2d 1027 (9th Cir. 1990), federal law recognizes that governmental records may contain sensitive information whose disclosure in litigation would cause more harm than good. However, that is the crux of the privilege issue – is the disclosure more necessary in terms of the needs of the truth finding process than any harm which may be caused by disclosure of the records. Plaintiff seeks inmate Thornton's disciplinary records.

Of course, prison officials have a duty to understand that dangerous proclivities of their supervised inmates. This duty stems from a need to protect oneself as well as others from an inmate's rampages. It is most reasonable to assume that prison officials would be aware of an inmate's bad acts, and hence dangerous proclivities, from the disciplinary records amassed by that inmate. Information contained within Thornton's disciplinary records will go far in aiding or destroying plaintiff's case, i.e., the records will show whether reasonable prison officials would have been concerned in placing any other inmate with inmate Thornton given his record, or lack thereof. Other than the general need for non-disclosure of one inmate's records to another inmate, defendants have pointed to no specific harm which will accrue from disclosure of Thornton's disciplinary records in this case. These records can also be disclosed pursuant to a protective order to mitigate most any harm potentially realizable from disclosure.

Thornton's disciplinary records from the time of initial incarceration up to the time of the event precipitating the complaint in this action shall be produced for *in camera* review. The court will determine what may be relevant to the claims and defenses in this action, and will thereafter order disclosure of relevant materials pursuant to a protective order. If especially sensitive material is contained within the records, defendants' counsel shall so notify the court with specifics.

\\\\\

Accordingly, IT IS HEREBY ORDERED that:

1. The subpoena attached to this order is a subpoena issued by the court pursuant to this order;

2. Pursuant to the subpoena, the medical and disciplinary records of Inmate Thornton, CDCR No. P-76816 *in their entirety* shall be produced to the undersigned for *in camera* review on August 23, 2007 at 9:30 a.m. in the courtroom of the undersigned;

3. Defendants' counsel, Constance Picciano, shall serve the appropriate CDCR official with the subpoena;

4. Pursuant to 45 C.F.R. 162.512(e)(iii), counsel Picciano shall ensure that inmate Thornton is mail served with a copy of the subpoena and this order;

5. Inmate Thornton is advised that he has the right to object to production of his medical records, and that the court shall adjudicate any such objection; if he desires to object, inmate Thornton shall file a written objection with the court setting forth his specific objections no later than August 23, 2007; the court will expeditiously consider and rule upon any objections prior to any disclosure outside of the *in camera* review;

6. If disclosure of any information is later found appropriate, the court shall fashion a protective order for any inmate Thornton information which is to be disclosed for the purposes of this action.

DATED: 7/25/07                                          /s/ Gregory G. Hollows

                                                        GREGORY G. HOLLOWS
                                                        UNITED STATES MAGISTRATE JUDGE

GGH:009
reed0060.sub